## CASE OF THE EMPIRE CITY BANK.

*Court of Appeals; December Term*, 1858.

INSOLVENT BANK.—SPECIAL PROCEEDINGS.—CONSTITUTIONAL LAW. —CONSTRUCTION OF STATUTES.

It is an error for the court at general term to reverse an order of the special term for want of jurisdiction, where a portion of the papers, in which the fact conferring jurisdiction, if it existed, would regularly appear, were not before them.

Proceedings to charge the stockholders of a bank with the debts of the corporation, commence with the order of reference and notice thereof in the nature of process, to the stockholders. The referee's report is to the Supreme Court, at special term, and the parties interested have a right to appeal to the general term. These proceedings are therefore had before a court of general jurisdiction, and in such cases jurisdiction is to be presumed until the contrary appear.

Determinations in the nature of judgments obtained in such proceedings against the stockholders cannot be questioned for defect of jurisdiction, where the formal steps to subject the persons of the parties to the proceedings have been taken, and the proceedings are such that the existence of the jurisdictional facts may be fairly considered as implied.

The General Banking Law (*Laws of* 1838, 253), exempted the stockholders from liability, but reserved to the Legislature the right to repeal or alter it. The constitution of 1846, and the act of 1849 (*Laws of* 1849, 340), made stockholders individually liable.

*Held*, that the latter provisions were not unconstitutional within the provisions of the Federal Constitution, as impairing the obligation of contracts in their application to the stockholders in a bank organized subsequently to 1849.

Case of the Empire City Bank.

The provisions of the act of 1849 are not unconstitutional, as depriving stockholders of trial by jury; nor as depriving them of property without due process of law; nor as conflicting with the provision that corporations may sue and be sued. The latter provision is enabling, not restrictive, and does not preclude other forms of proceedings.

- What is "due process of law" considered.

In proceedings under that act, the referee is to pass on and determine the amount of the debts to be paid, as well as the parties who are to pay them. The receiver's statement is not conclusive.

The provision of the constitution of this State imposing individual liability upon the stockholders, requires from them besides loss of the amount of capital stock paid in, the contribution in addition of a sum equal to the amount of their respective shares of stock.

Section 28 of the act of 1849 provides that the apportionment may be suspended for certain cause, not exceeding one year. Section 18 provides that if, in the opinion of the justice, further time is required, he may allow it not exceeding ninety days.

    *Held*, that where the apportionment was suspended for a year, and for some weeks after the expiration of the year, there was no special term in the district in session, it was competent for the justice at the first special term which was held, to order a delay for the whole period of ninety days, notwithstanding the delay that had already occurred in waiting for a special term.

*It seems*, that even in special proceedings before a tribunal of limited jurisdiction, provisions of law fixing the time for intermediate steps after jurisdiction has been once acquired are to be deemed directory, and a disregard of them does not avoid the proceedings.

Where the receiver reports certain claims against the bank as disputed and to be litigated, the referee should not charge them upon the stockholders, and if he does so his report should be referred back.

Who are liable as "stockholders" in such proceedings.

A stockholder who is also a creditor cannot offset his claim against his assessment as a stockholder.

    Appeal from an order reversing an order confirming the report of a referee in proceedings to enforce the personal liability of the stockholders of an insolvent banking association.

    The previous proceedings in this case are reported 4 *Ante*, 118, and 6 *Ib.*, 385. From the order of the general term reported in the latter volume, the receiver now appealed.

    *Edgar S. Van Winkle* and *John M. Mason*, for the appellants.—I. The act of 1849 is not unconstitutional. 1. It is not in conflict with the constitution of the United States, article 1, section 10. It is not a law impairing the obligation of contracts. It is prospective, and only applies to contracts made after the

1st of January, 1850. 2. It is not in conflict with § 2 of Art. 1 of the constitution of this State. That section gives a right to trial by jury only in cases in which it had been *theretofore* used. No such cases were known specifically before the constitution. This proceeding is purely equitable in its character, and jury trials were unknown in equity cases, except by special statutory regulation. 3. It does not violate § 6 of Art. 1. The parties are not deprived of property without due process of law : the act is under the provision of the constitution, and the act which carries out a specific provision of the constitution is *due process of law*. (*Const.*, Art. 8, §§ 2–7.) Therein it differs from the statute declared unconstitutional by a majority of the court in Taylor *a*. Porter (4 *Hill*, 140). 4. The clause in § 3 of Art. 8 of the constitution, declaring that " corporations shall have the right to sue, and shall be subject to be sued in all courts in like cases as natural persons," was an enabling clause, but was not intended to and does not prevent their being proceeded against specially in cases of fraudulent insolvency. But this proceeding is a suit. A natural person can be sued by proceedings in equity, by attachment, by insolvency, &c. The constitution merely declares that those artificial persons may sue and be sued the same as natural persons. 5. It is not in violation of § 1 of Art. 1 of the State constitution which declares, that no *member* of this State shall be disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers. Proceedings of the like nature were the laws of the land in 1846 and 1849. (Briggs *a*. Penniman, 8 *Cow.*, 387 ; Murray's Lessee *a*. The Hoboken Land and Improvement Company, 18 *How.* ( *U. S.*), 272 ; 1 *Rev. Stats.* (1830), 592, 593 ; *Ang. & Ames on Corp.*, 2d ed., 494 ; Marcy *a*. Clark, 17 *Mass.*, 335.) 6. It does not violate § 3 of Art. 8 of the constitution. The act does not deprive them of any right to sue, or give them any greater privilege. The object is to prevent the Legislature from giving them privileges against creditors which individuals do not possess. This act gives no such privileges, but gives their *creditors* greater privileges and more summary process against the corporation than against the individual. 7. But these proceedings are not against the corporation at all. They are against the stockholders in their natural capacity. They arise only after the corporation has been declared insol-

Case of the Empire City Bank.

vent, which can only be done by due process of law. (*Act of* 1849, §§ 5–10.) They are proceedings by a receiver, and according to laws applied not only to corporations but to individuals for a long period of time. (Slee *a.* Bloom, 20 *Johns.*, 669.) 8. The act of 1849, instead of being in conflict, is in conformity with the constitution. (Art. 8, §§ 2–7.) It was enacted to carry into effect these sections of the constitution. It prescribes the mode of enforcing the general principle affirmed by the constitution. 9. The words of Art. 8, sec. 7, of the constitution, " individually responsible to the amount of their respective share or shares of stock for all its debts and liabilities," must mean an individual responsibility *beyond the stock subscribed* to the amount of such stock. The same language had been employed frequently in various acts of the Legislature, and had been invariably construed to mean a liability beyond the cost of the stock itself to the amount of the par value of the stock. (Briggs *a.* Penniman, 8 *Cow.*, 387; Bank of Poughkeepsie *a.* Ibbotsons, 24 *Wend.*, 473.) Unless the clause is so construed, it would have no meaning whatever. Without it, the money paid or agreed to be paid by the shareholder for his stock would be liable to the creditor for the " debts and liabilities of the corporation." But the words of the constitution provide for an *individual* personal *responsibility* greater than would exist without those words. And by the same clause the " *individual responsibility*" is limited to the " amount of their respective shares." 10. The various sections of the act of 1849 are not in violation of the constitution. The stockholders are represented by the corporation. Section 5 merely provides for suits against the corporation, and the stockholder is not known under the act as apart from the corporation, until after the corporation is declared insolvent, when he is called upon by the receiver acting for the creditor to pay his share of the liability under the constitution. Sections 6–13 apply to proceedings against the corporation in its corporate capacity, and are in accordance with § 3 of Art. 8 of the constitution. Section 17, by which the notice to the stockholders is not required to be personally served, is a mere statutory regulation showing the mode of bringing a party before the court, and is upon the same principle as proceedings for attachment against non-resident and publication against absent defendants. Sections 25, 26, and 27 relate to appeals. The Legis-

lature has full power, under the constitution, to fix the right and mode of appeal. (*Const.*, Art. 6, §§ 5, 9, and 25.)

II.—The court had not lost jurisdiction of the proceeding for the assessment of the stockholders, by reason of any delay in such assessment, occasioned either by the laches of the receiver or referee, or by the action of the court itself. 1. By section 18 of the act, the referee is required to report at the first special term after the expiration of six weeks from his appointment. The appointment was made August 14, 1855; the six weeks expired September 25, 1855; the first special term thereafter was held in October, 1855; the referee could report at any time during that term. Before its expiration a creditor and a stockholder applied to the court for a suspension of proceeding under section 23. This application was opposed by the receiver, but a delay and suspension of proceedings for six months was granted by the court (Mr. Justice Cowles), with liberty to the petitioners or others to apply for a further delay. This suspension and delay was further continued by the order of the court (Mr. Justice Roosevelt) to October 29, 1856. Both these orders were granted on the grounds permitted by section 23, viz.: "The pendency of litigations or controversies for the recovery of demands against the association." When the suspension expired, October 29, 1856, the October special term had adjourned. There was no special term until December. At that special term the referee applied to the court for an extension of time under section 18, and an order was made December 16, 1856, granting ninety days' further time to the referee to complete his appointment. The report was presented, an order made thereon within the period, March 16, 1857. 2. The prohibition contained in section 23, against the delay exceeding one year, does not refer to a delay in presenting the report as required by section 18, but to a delay or suspension of the necessary proceedings to make the apportionment and present the report, for the reasons stated in section 23. 3. The statute contemplates that the referee shall have a certain period of time in which to make his assessments. 1st. Six weeks from the time of his appointment. 2d. Whatever time may elapse after the six weeks until the expiration of the next special term held in the county. 3d. A further period not exceeding ninety days, " if in the opinion of the justice holding the term further time is,

Case of the Empire City Bank.

necessary, to enable the referee to complete the apportionment, or to take further proof." 4. The suspension or delay which can be granted under section 23, is a suspension of this time, a delay of the work to be done within that time, and it is a delay of time to the extent of one year over and above the time fixed by section 18.

III.—The section itself is merely directory. It cannot be considered mandatory, so as to defeat the intent of the act, and deprive the creditors of the privileges granted them by the act itself. The act does not declare the proceedings null if not strictly pursuant to the statute. (*Smith on Stats.*, 782–796; The People *a.* Cook, 14 *Barb.*, 259, 290–295, 323, 326, and cases there cited; Wood *a.* Chapin, 3 *Kern.*, 509; see opinion of Judge Mitchell below.) 1. Any other construction of the act would place it in the power of any justice of the court, or any receiver or referee, to defeat the act and take from the creditor all the rights given him by the constitution and the act itself. 2. It is not the policy of the law to place such unlimited power in the hands of the officers of the court, or of the court itself. 3. The intent of this law is to give to creditors a *summary* remedy against a defaulting bank. The time limited for the action of the officers who are to execute it is consequently short. The object of the law is to *secure* the right of the creditor, and to secure it by a *summary process*, not to *deprive* him of that right by the action of parties over whom he has no control. 4. Although this is the case, yet the creditor cannot in any manner act *himself* after the first application to declare the bank insolvent. All the subsequent proceedings are entirely in the hands of parties designated by the law itself; the court, the receiver, and the referee. Their duties are fixed. If they do not execute them either through malfeasance or nonfeasance, the creditor cannot be deprived of the right vested in him by the constitution and law, which right was a *part of the contract* made by him with the bank and the stockholder at the time he became a creditor. See The People *a.* Supervisors of Chenango (4 *Seld.*, 317). 5. When the Legislature, carrying out the principle declared in the constitution, enacted the statute of 1849, and fixed the manner in which the creditor should obtain his remedy, and therein declared that the remedy given to the creditor by the constitution should be enforced against the stock-

holder in the mode prescribed by that act, "*and in no other manner,*" they did not mean to deprive the creditor of his only remedy by a delay of a single day in one of the executive officers appointed to manage the details prescribed by the act itself. The law, therefore, must be considered as simply directory. 6. If the law is mandatory in the case of a referee making an apportionment, it is equally mandatory in the case of a receiver making a dividend as required by section 12. The utmost time allowed to the receiver is one hundred and eighty days, unless his action is delayed by section 23. If the receiver should neglect to make the dividend within the year, the rule contended for by the respondents would take from the court the power to enforce the payment of a dividend after the expiration of the year. 7. The delay alleged, even if in violation of statute, does not take from the court jurisdiction.

IV.—By section 18 of the act, the justice holding the special term was vested with full discretionary power to grant further time to a referee to make his report. That discretion having been exercised by the order of December 16, it was not competent for any other justice, at special term, to act in the matter, and in effect vacate an order already made.

V.—All the provisions of the act have been strictly complied with by the receiver and referee. 1. The report of the receiver required by sections 14 and 15, is in strict accordance with the requisitions of the act. It states the account of the debts and liabilities remaining unsatisfied at the time of the report, showing the parties to whom the indebtedness existed, the amount and the nature of the claim, whether for services, deposits, certified checks, &c. It is not necessary that the nature of the services, or the time of making the deposits should be stated in full. That would require a very lengthy and unnecessarily particular account. It is as full as any account required from a trustee or executor in the first instance. The object is to give information to the court. If it were to pass the account, it would be a sufficiently particular statement to render, subject to examination and further proof when required. It sets forth the amount of cash realized by the receiver, showing from whom received and the amount from each. It also shows the expenses and allowances claimed by him, the payments that he has made, the amount divided and the dividends declared. It

also contains the list of stockholders, the nominal amount held by each, and the residence of each so far as the same could be ascertained. The fact that all the residences of the stockholders do not appear in the schedule, is no evidence that the residence of the others could have been ascertained. The presumption, until evidence to the contrary is produced, is that the receiver complied with the requirements of the law. The order of the court, dated August 14, reciting that the requirements of sections 14 and 15 had been complied with, must be taken as a declaration by the court that the same had been done. 2. The reference required by section 16 was made, and the order contains every thing required by that section. 3. The referee gave the notices, and caused them to be served in the manner required by section 17. 4. The hearing was had before the referee in the manner required by section 18.

VI.—The objection, that the United States Trust Company cannot act in this matter, for the reason that its charter is unconstitutional, or that it has forfeited its character, if not unconstitutional, is not well taken. (United States Trust Company a. Brady, 20 *Barb.*, 120 ; affirmed in Court of Appeals.)

VII.—Nor is the objection well taken, that the stockholders have not the opportunity of contesting the claims with which they are charged. The stockholders would not have had that right before the failure of the bank. It was exercised by their representatives—the Board of Directors. It was, after the failure, exercised by the receiver, also the representative of the stockholders.

It can be exercised by the receiver under the direction of the court after the assessment, and any funds remaining in the receiver's hands, after payment of the debts, revert to the stockholders. The summary nature of the act does not contemplate an adjudication on claims. The receiver's report should show a *prima facie* case, and that is enough.

VIII.—The objection that notices of the apportionment were not properly served, can only be taken by the parties affected by such irregularity. The statute creates a *several liability* on the part of each stockholder. The omission to serve on one stockholder may release that one, but it does not exempt another, whose rate of assessment is not increased by such omission. Besides, there are no facts before the court to show that

such services were not made on all the parties residing in the county of New York.

The above points refer to all the cases now before the court. Special questions arise in some of the cases in addition to the general objections applicable to all. They will be now considered.

IX.—The United States Fire Insurance Company appeared by the stock-ledger to be the holder of 400 shares of the stock of·the bank. These were held as collateral security for a loan of $8500 (afterwards reduced to $5500), made by the Insurance Company to Sloan & Leggett. The stock was transferred to the Insurance Company *on the books of the bank.* The referee charged Sloan & Leggett with the stock. The receiver excepted, and claimed that the stock should be charged to the United States Fire Insurance Company. The court sustained the exception of the receiver.

The receiver claims that the United States Fire Insurance Company, whose name appears on the books of the bank as a stockholder, at the time of default in payment of the debts of the bank, is to be considered a stockholder, and chargeable as such for the purposes of the assessment. 1. By section 2, stockholders are not only those whose names appear on the books of the bank, but also " equitable owners" of stock. In case the name of a party is placed on the books, without his assent, then the equitable owner is the stockholder. If they hold as trustees, the equitable owner, or.the *cestui que trust,* who directs the investment is liable. In case of an investment by a guardian or other trustee, in the name of the *cestui que trust,* without his assent, the trustee is chargeable. 2. The provision of keeping a book for the names of the stockholders is a new *statutory* provision. It was formerly necessary to the bank for the proper transaction of its business, but was never before enforced by statute (§ 4). 3. It is also made compulsory upon the bank, that this book should " *be open to public inspection,*" and a non-compliance with this provision of the statute subjected the bank to a penalty of $100 per day. 4. The object of these provisions, so minute in these details, is, that the party about to become a creditor of the bank may know who are the parties individually liable to him, under the constitution and the statute, for the debts the bank are about to contract with him, and that he may be kept constantly informed who these parties are and

what changes are made in them. 5. Without this explanation, the only object of the provision would have been to satisfy public curiosity. We cannot presume that a statute was enacted with that intent. 6. Formerly, a creditor could make his inquiries as to the resources of a bank, its mode of transacting business, and the character of its officers, in the same way that he could with regard to any other party. The constitution and act provided an additional security, viz., the individual responsibility of each stockholder. This would be of no avail to him unless he were able to examine for himself who were the stockholders, and to pass upon their responsibility. (Roosevelt *a.* Brown, 1 *Kern.*, 148.) 7. Such being the case, the stockholder who allows his name to be upon the books, becomes a guarantor to the creditor to an amount equal to that of his stock. (Roosevelt *a.* Brown, *Ib.*, 148; Adderly *a.* Sloan, 6 *Hill*, 624; Stebbins *a.* Phenix Fire Insurance Company, 3 *Paige*, 350.) 8. The evidence afforded by the books is only presumptive, and can be repelled in various ways; such as proof of the transfer to a party without authority, or the cases mentioned in section 2. 9. The holder of stock is liable for all the debts of the bank, contracted after January 1, 1850, and on which default in payment is made while he is a stockholder. This includes not only debts contracted while he is a stockholder, but also all prior debts (§ 3).

X.—Thomas W. Pearsall appeared on the stock-ledger a holder of 100 shares of stock, and held them as collateral security for a loan to Sloan & Leggett.

XI.—William B. Scott & Co. appeared on the stock-ledger as holders of 120 shares of stock. They held them as collateral security for a loan to Peter Poillon, Jr. The stock was transferred to them on the books, and the dividends were collected by them.

XII.—Henry Leger appeared by the stock-ledger as the holder of 240 shares of stock. He held them as collateral security for a loan to Peter Poillon, Jr., and had the stock transferred to his own name on the books in order to prevent Poillon from making other use of it.

XIII.—The Chatham Bank appears by the stock-ledger to be the holder of 40 shares of stock. This was held as collateral security for a loan to Hiram Fuller.

XIV.—William J. Staples sold 50 shares of stock in Novem-

ber, 1854. It does not appear whether it was transferred on the books or not. In either case, he is chargeable as a stockholder. It was only a transfer upon the books to another party that he could become exonerated from liability.

XV.—Elijah F. Purdy, trustee, appears upon the books as holder of 51 shares, as trustee. For this, Purdy is personally liable. 1. The mere name of trustee, without any proof that such trust existed, would not absolve him from his personal liability. 2. He is chargeable as trustee, under section 2 of the act, as a " trustee voluntarily investing his trust fund in the stock." 3. If it was unlawful for him to become such trustee, he cannot take advantage of his own illegal acts as against the creditors.

XVI.—John P. Hone was charged by the referee as the holder of 20 shares, when, in fact, he was the holder of 120 shares, and the error was corrected by the court.

XVII.—Jonathan Purdy applied to the court, on the motion to confirm the report, for the allowance of an offset of his claim against the bank, amounting to $1287.39, in opposition to his assessment. The application was refused. No such offset can be allowed. The statute does not contemplate any offset. Each stockholder is liable for a sum equal to the whole amount of his stock, or to a *pro rata* assessment thereon sufficient, if assessed on all the stock, to pay all the debts. All the creditors have equal claims against all the stockholders. No party has the right to assume the position of a *preferred creditor*. If an offset is allowed, and there should be any default in collecting the assessment, the party obtaining the allowing of such offset would become a preferred creditor.

XVIII.—The Supreme Court erred in reversing the judgment of the special term and dismissing the proceedings, on the ground that the facts deemed essential to confer jurisdiction did not appear on the papers. 1. It is not necessary, in any proceeding originating in a court of general jurisdiction, that the facts conferring jurisdiction should appear on the face of the papers. 2. There is no distinction now in regard to jurisdictional averments between " actions" and " special proceedings," even if there ever were in the Supreme Court. Before the Code, every special proceeding must have been authorized by some special statute, to be prosecuted in some court or tribunal, but since

then (*Code of Procedure*, § 1), they both come under the general head of "remedies," and the jurisdiction of the court is as general in special proceedings as in actions. By the constitution (Art. 6, § 3), its jurisdiction is declared to be general. 3. The only way in which a question of jurisdiction can be determined in the Supreme Court, unless the want of jurisdiction appear expressly on the papers, is by evidence of the facts. 4. The facts constituting jurisdiction do sufficiently appear in this case. For every presumption, intendment, or influence is to be taken in favor of the existence of the jurisdiction until the contrary expressly appears. (Harrington *a.* The People, 6 *Barb.*, 608 ; Barber *a.* Winslow, 12 *Ib.*, 102; Miller *a.* Brinckerhoff, 4 *Den.*, 120.) 5. The act of 1849, ch. 226 (p. 340 of *Session Laws*), is in no sense a private statute, but it is a public one, of which courts are bound to take notice without being specially pleaded. 6. This being a remedial proceeding for the protection of the citizen, every intendment will be made in favor of the judgment at special term, and that the court had jurisdiction, unless the contrary appear on the face of the record or be affirmatively shown *aliunde*. (See Foot *a.* Stevens, 17 *Wend.*, 483 ; Hart *a.* Seixas, 21 *Ib.*, 40; Castle *a.* Mathews, *Lalor's Sup. to Hill and Denio*, 438.) 7. The proceeding immediately under review could not bring up the question of jurisdiction on the alleged ground. These proceedings to assess stockholders spring out of, and are founded on the order to declare the bank insolvent. That order cannot be collaterally attacked. It is binding, like any other order, until set aside or reversed. 8. This proceeding commences with report of July 28, 1855, and the order thereon of 14th August, 1855, and no reversal of the judgment rendered thereunder can be made, except for error of law or fact in these proceedings. The report states all that is necessary to sustain jurisdiction. It avers that the Trust Company was *duly* appointed receiver, &c., which is sufficient, unless the defendants controvert such statement, and then it is a question of fact. Section 161 of Code of Procedure, which introduces a new rule. (See Cruyt *a.* Phillips, 16 *How. Pr. R.*, 120; S. C., 7 *Abbotts' Pr. R.*, 205.) 9. If these proceedings go back to the order declaring the bank insolvent, there is sufficient in that order to sustain the jurisdiction. It recites not only the mere fact that the Empire City Bank was a bank issuing bank notes

to circulate as money, but, in more general terms, that the application under which the order for a receiver was granted had been made in pursuance of the statute. 10. To go back still further, the affidavit of Purser involves an allegation of the fact that the Empire City Bank issued bank notes. On this affidavit an order to show cause why the bank should not be enjoined, &c., was served on the bank, and a hearing was had thereon, and after hearing counsel for the bank, the court makes this order. 11. The recital that the Empire City Bank was a bank of issue is a recital of facts, of which the courts can take, and are bound to take, judicial cognizance. The act to authorize the business of banking is a public act. All the associations acting under it are obliged to record their articles, and they become public records. 12. It is, at least, doubtful whether there can be any association under the act of 1838 which is not a bank of circulation. The whole scope of that act extends only to banks of circulation; and in the act of April 12, 1848, amending said act of 1838, we have a legislative interpretation of the act of 1838 which shows these banks must be banks of circulation. (*Laws of* 1838, 245; *Ib.*, 1848, 462; *Ib.*, 1840, 306, ch. 363; *Ib.*, 1844, 416, ch. 281, § 1; *Ib.*, 1851, 375, § 1.) 13. The papers presented by the respondents to the court below were in no respect a record. It was a collection of papers selected by the respondents. All the exhibits annexed to the referee's report were omitted. It did not include all the papers on which the preliminary proceedings were founded. The record, as a record, if right in including the preliminary proceedings was manifestly defective, inasmuch as it did not include them all. If it had been confined to the proper matter, the want of jurisdiction, if inquirable into, was so only as a matter of fact, and the receiver had a right to be heard thereon, and to introduce proofs. It was apparent on their face that some papers were omitted. The general term should therefore have dismissed the appeal, or at all events, suspended it until the parties had produced all the papers. 14. In every case, if a process or order emanate from a judge or court having jurisdiction of the subject-matter, and is in substance and effect such as the court or officer was authorized to issue or make, if, in issuing or making it, it was the duty of such judge or court to pass judicially on any question of fact, the presumption of law is that he

did so ; and although a mere recital in an order or process is not proof of facts constituting jurisdiction, yet the recital does not hurt, and the facts may be inquired into and controverted *aliunde.* (Brittain *a.* Kinnaird, 1 *Brod. & Bing.*, 432; Savacol *a.* Boughton, 5 *Wend.*, 170, 172 ; Bennet *a.* Burch, 1 *Den.*, 141, 146 ; 2 *Cow. & Hill's Notes*, 1016, 1020.) 15. Further, with the proof before the general term, that this was a bank of issue, it should have allowed an amendment by inserting the formal allegation, so as to conform the petition to the facts proved. (2 *Rev Stats.*, 424 (1st ed.) ; *Code*, § 173 ; Foot *et al. a.* Stevens, 17 *Wend.*, 483, 488 ; Field *a.* Hawkshurst, 9 *How. Pr. R.*, 75 ; Egert *a.* Wicker, 10 *Ib.*, 193 ; Bowdoin *a.* Coleman, 3 *Abbotts' Pr. R.*, 431 ; Bate *a.* Graham, 1 *Kern.*, 237.)

*John W. Edmonds*, for the respondents Purdy and others. The points made by the learned counsel are fully presented in the report of the proceedings in the Supreme Court, 6 *Ante*, 385, 406.

*S. Sanxay*, for other appellants.

By THE COURT.—DENIO, J.—I am of opinion that the determination appealed from cannot be sustained, upon the ground on which it was placed by the general term of the Supreme Court. It has not been contended but that the bank actually issued circulating notes, procured according to the provisions of the General Banking Law; for that fact was incidentally stated in several of the papers which were before the court. For instance, the second application of Mr. Purser, upon which the order to show cause was granted, complains that the bank had, subsequent to its failure, paid demands against it, to a large amount, to creditors other than bill-holders and depositors ; and the order to show cause itself, recites that the bank is an association issuing bank notes, to circulate as money. Moreover, the receiver, in his report, states that he had received the securities which had been placed in the hands of the superintendent of the banking department, *over and above the amount of the outstanding circulation of the bank ;* and the affidavit of Purser and Hone, upon which one of the orders to stay proceedings was granted, contains an estimate of the probable gains of the bank from the loss of its circulating notes, which had been issued to

customers. But the objection assumes that, in a special pro-
ceeding like this, primary application must, in order to confer
jurisdiction, contain a plain statement that the corporation be-
longs to the class mentioned in the statute—that is, that it is
a corporation, or joint-stock association, for banking purposes,
issuing bank notes, &c., to circulate as money, after the 1st day
of January, 1850. (*Laws of* 1849, 340, § 1.) As the bank was
incorporated in 1852, and as the incidental statements referred
to show that it was all along assumed that the corporation was a
bank of issue, the present objection is one of an exceedingly
formal character.

If it be conceded that an omission in the application to bring
the bank proceeded against within the statutory description
would render the proceedings void, it was incumbent upon the
parties who appealed to the general term to show that such a
defect really existed, by causing to be returned all the papers
which were before the judge who granted the initiatory order.

Now, it appears by that order that the judge had before him
not only the former application of Mr. Purser, but application
of the Union Bank, the American Exchange Bank, &c., of
Isaac Frost and others, all creditors of the bank proceeded
against, whose demands had been refused payment more than
ten days before granting the order. If these papers, which are
stated in the order to have been filed by the judge, contained
the allegation, the omission of which is complained of, the or-
der was unexceptionable. That they did contain it is rendered
probable by the fact that the order describes the bank as one
which issued circulating notes, a fact which the judge could
regularly have known only from the papers before him. The
other applications may have been deficient as to the allegation
equally with the affidavit of Purser, but it cannot be affirmed
that these were until it be shown by their production. I think,
therefore, that the general term fell into an error in reversing
the order of the special term for want of jurisdiction, where a
portion of the papers, in which the fact conferring jurisdiction
if it existed would regularly appear, were not before them.

But there is another answer to this objection. The process
against the stockholders commenced with the order of reference
of August 14, 1855. They were not parties to what the act
required to be done anterior to that order. The object of the

prior proceedings, besides restraining the bank from further transactions, was to procure an account of the unpaid debts and liabilities, and a statement from its books of the several persons who were and had been stockholders, from January 1, 1850, when the personal liability first attached, or in this case from its creation. Then the matter was committed to a referee, and notice in the nature of process was to be given to the persons appearing to be, or to have been stockholders (§§ 16, 17). This was the beginning of the litigation. The referee's report was to be made to a special term of the Supreme Court, where the parties interested were entitled to appear and contest its conclusions, with the right to appeal to the general term, and to this court, as in other cases.

It appears from this statement, that the proceedings to charge the stockholders with the debts of the corporation are required to be had before a court of general jurisdiction, in which the parties sought to be charged are entitled to appear and defend, and carry their case from court to court, by way of review, as in the case of regular actions in that court. In such cases I understand the rule to be, that jurisdiction is to be presumed, unless the contrary appear. (Foot *a.* Stevens, 17 *Wend.*, 483, and cases cited.) The Supreme Court at special term had general jurisdiction of proceedings against the stockholders of banks of issue, to charge them with the unpaid debts of such banks. The parties now litigating were proceeded against as persons so liable. Determinations in the nature of judgments were obtained against them, establishing such liability for the debts of the Empire City Bank.

Assuming that nothing appeared to show whether that bank was or was not a bank of issue, still the judgments cannot be questioned for defect of jurisdiction, because they were rendered by a court having general jurisdiction of the subject, and the formal steps had been taken to subject the persons of the parties to the proceeding.

As an objection for defect of proof that the association was a bank of issue, the answer is, that it appeared *prima facie*, from the report of the receiver, that it issued currency, and nothing to the contrary was shown on behalf of the stockholders. It may be said, too, that this fact was impliedly conceded by the course of the proceeding, for neither in the voluminous testi-

mony which was given on behalf of the stockholders before the referee, or the numerous exceptions which were taken to the report, is there any suggestion that the bank did not belong to the class which was subject to this jurisdiction. As such a fact, if it existed, could have been easily established, and would have put an end to the controversy, by showing that no liability existed, the omission even to suggest it is an implied admission that no question of that kind could be successfully made.

That point being disposed of, the other objections may be taken up in their natural order. The statute under which the proceedings were had, was challenged as being a violation of the constitution of the United States and of this State. By the Federal constitution, no State can rightfully enact a law impairing the obligation of contracts. It is argued that, by the General Banking Law, the associations which it authorizes are alone responsible for its contracts, the shareholders being wholly exempt from liability; and it is insisted that this is in the nature of a contract between the State and the shareholders, and that the constitutional guaranty of the integrity of contracts in the national constitution would be illusory, if a State could, by changing its constitution, subvert all existing engagements; and hence that the guaranty applies as well to State constitutions as to other State laws. Without denying or affirming the soundness of these positions, it is enough to say that the General Banking Law expressly reserves to the Legislature the power to alter or repeal it (*Laws of* 1838, 253, § 32), so that any changes, which it or the people think to make, are fully authorized by the provisions of the supposed contract itself. This bank was created subsequently to the constitution and to the act of 1849, and the provisions as to the personal liability of the shareholders attached to it from its inception, and in judgment of law were voluntarily assumed by the shareholders.

The act is also objected to on the ground that it takes away from the stockholders the right of trial by jury, and that it deprives them of their property and rights otherwise than according to the law of the land, and without due process of law, contrary to the bill of rights incorporated into the first article of the constitution of the State. The trial by jury is preserved by the constitution in all cases in which it had been used prior to its adoption. But in controversies cognizable in courts of equity,

a jury trial was never in general resorted to. The facts were determined by the court or its officers, or by referees. Particular issues might be ordered for trial by a jury, but this was discretionary, except in a few cases where there were particular statutory provisions. The winding up and settling of the affairs of insolvent corporations fell within the jurisdiction of courts of equity from the nature of the case, the forms used in courts of law not being adapted to such controversies; and we accordingly find that it was the constant practice of the Court of Chancery to entertain suits for that purpose, and by its decree to determine who were stockholders and contributors, and in what proportions they were to contribute, and to cause an account to be taken of the unsatisfied debts and liabilities, and to decree a distribution accordingly. Slee *a.* Bloom (19 *Johns.*, 456), and Briggs *a.* Penniman (8 *Cow.*, 387), are examples of suits of that character, and the jurisdiction was afterwards, and before the adoption of the constitution, regulated by statutes. (*Rev. Stats.*, 464, § 398, *seq.*) It is very plain, therefore, that this is not a case in which the stockholders, who are sought to be charged, had a constitutional right to a trial by jury.

Another and more difficult question arises upon the provisions of the act for ascertaining the debts due from the insolvent corporations, with which the stockholders are to be charged. Upon one construction of the act the account of debts and liabilities of the bank is to be taken and conclusively established by the receiver, upon an *ex parte* examination to be made by him; and the stockholders, who are obliged to pay them, are deprived of any opportunity of appearing or making a contest upon that question; and the aggregate of the debts so established is to be apportioned by the referee among the stockholders, in proportion to their respective shares of the stock, and judgment is eventually to be rendered according to the apportionment, after it has been revised and confirmed by the court. Thus, it is argued, the amount of the burdens which is thrown upon the stockholders, which is; in its nature, a judicial question, is conclusively determined in a proceeding unjudicial in its nature, and by a person who is not a judicial officer, and by a process which precludes all litigation on the part of the persons who are to be charged. The argument, so far as it assumes that the receiver is to proceed *ex parte*, seems to be well founded, for I

do not perceive that the creditors have any right to intervene or to be heard before the receiver. He is upon his own motion and in his own way to take into his possession and administer assets of the bank, and to make a dividend, and then if any debts or liabilities remain unsatisfied, he is to render to a justice of the Supreme Court in the district " a particular account of said debts and liabilities so remaining unsatisfied." He is also to report a list of the persons appearing to be or to have been stockholders (§§ 11–15).

So far the stockholders are not to receive any notice, and are not allowed, so far as I can perceive, to appear, or to be heard in the proceeding. But upon this report being received, the justice is to refer it " to a referee to be appointed by him, with directions, after giving notice to all persons concerned, to apportion the debts and liabilities of such corporation, &c., among the said stockholders rateably, in proportion to their stock, &c., and to report his proceedings to such justice or some other justice of the Supreme Court in the same district" (§ 16).

The argument on the part of the stockholders assumes that the amount of the debts and liabilities which the receiver had reported is made conclusive upon the stockholders, and that the only duty of the referee is to ascertain and determine who the stockholders are who are to pay that amount, and the proportion to be paid by each. The order of reference in this case does not declare that the aggregate of the receiver's list of debts is to be apportioned, but in the language of the statute it directs the unpaid debts and liabilities to be apportioned, &c.

Upon mature reflection, I have come to the conclusion that the referee is to pass upon and determine the amount of the debts to be paid, as well as the parties who are to pay them, and that he is not obliged to take the receiver's statement of debts as conclusive. The language favors this construction. It is not the amount reported that the referee is directed to apportion, but the unsatisfied debts and liabilities of *the bank*. If it had been intended that the receiver's report of debts should form the basis of apportionment, the section would have declared that the amount so reported should be divided. Again, we are not, in the absence of precise language, to intend that a matter so strictly judicial in its nature, would be committed to a person whose duties, in all other respects, relate to matters of

administration. And, moreover, the act should, if practicable, be so construed that it should not violate any constitutional provision or any common principle of justice. Other parts of the act are consistent with the idea that the referee is himself to ascertain the amount of the debts. Section 18 requires the referee to hear the allegations and proofs of all parties and persons interested in the matter referred ; " and besides ascertaining the persons chargeable as stockholders, he is to determine the amount chargeable to each." So the justice holding the special term is to hear the allegations of the parties and persons interested. If it were the intention of the act that the receiver's statement of debts should be conclusive, the further contest would be among the stockholders alone, and it would be natural that the act should designate them as the persons who were allowed to litigate before the referee and at the special term, instead of using general language, which fairly embraces the parties who are to receive as well as those who are to pay sums to be finally awarded. It is quite consistent with this view, that the referee should take the receiver's list of creditors as presumptive evidence of the amount of the burden to be apportioned among the stockholders, subject to be modified by the proofs and allegations of the stockholders or the creditors.

The receiver is authorized to adjust and settle the claims of creditors by mutual agreement, by amicable reference, or by suits before the courts, though he has no judicial authority. (*Act*, § 11 ; 2 *Rev. Stats.*, 41, § 719 ; *Ib.*, 461, § 73.) Hence his report would have a certain degree of authenticity, though it would not, in my opinion, be conclusive upon the stockholders. Certainly it would not conclude them in respect to any debts not adjusted by the receiver, in one of the methods referred to.

It must unavoidably happen, that an account of creditors, prepared immediately after the failure of the bank, would be more or less imperfect. Suppose additional debts to be discovered while a reference is pending, or the proof of payment of debts reported to be ascertained ; is the referee to refuse to hear the proof of this, and is he compelled to divide the sum reported by the receiver, however erroneous it may be ? We are bound to assume, if the terms of the act will allow it, that the Legislature designed to provide a just and practical system of dealing

with the estates of insolvent banks; one which might be successfully marked out in practice, and which should violate no principle of constitutional law. I am satisfied that the construction which I have pointed out is the only one which will fulfil these conditions, and that it is warranted by the language which the Legislature has employed.

The referee's report is to be made to a special term, before which, as we have seen, all the parties interested have a right to appear and contest its conclusions, and to appeal. This, in my opinion, may be considered due process of law within the meaning of the constitution. The proceedings, it is true, are summary; but it is within the discretion of the Legislature, in a case in which a trial by jury is not required, to determine whether a controversy, judicial in its character, shall be pursued by a regular action or by a summary proceeding. It has always assumed to prescribe the jurisdiction of the courts, and to regulate the proceedings at law and in equity; and this right is expressly reserved by the constitution. (Art. 6, § 5.) The provision for giving notice was relied on by the counsel for the stockholders to show that the proceeding was not due process of law. The notice of hearing before the referee is to be personal, or by service at the residence of the party, as to the stockholders who live in the county where the bank was located; and by advertisement in the State papers and in newspapers in the county as to all other stockholders (§ 17). It may therefore happen that some of the persons who are made liable will not have received actual notice; and the question is, whether personal service of process, or actual notice to the party, is essential to constitute due process of law.

We have not been referred to any adjudications, holding that no man's right of property can be affected by a judicial proceeding, unless he have personal notice. It may be admitted that a statute which should authorize any debt or damage to be adjudged against a person upon a purely *ex parte* proceeding, without a pretence of notice or any provision for defending, would be a violation of the constitution, and be void; but where the Legislature has prescribed a kind of notice by which it is reasonably probable that the party proceeded against will be apprised of what is going on against him, and an opportunity is afforded him to defend, I am of opinion that the courts have not.

the power to pronounce the proceeding illegal. The Legislature has uniformly acted upon that understanding of the constitution. Thus attachments are allowed against parties represented to be absent, absconding, or concealed debtors, and the proceeding results in the sale of their property, and the appropriations of its avails to the benefit of the alleged creditors; and the only notice required is a publication in certain newspapers. (2 *Rev. Stats.*, 3, §§ 1, 28.) So in justices' courts, attachments are authorized against persons who have departed, or are about to depart from the county, or who keep concealed, with a certain intent; and the only notice required is the leaving the attachment at the last place of residence of the party, if such place exists, or if not, with the person in whose possession the goods may be found. (2 *Rev. Stats.*, 22, §§ 12, 31.) There are many other examples of the same kind, such as foreclosing mortgages by advertisement, discharging an insolvent debtor upon the petition of a portion of his creditors, those not petitioning being notified of the proceeding only by advertisement in the newspapers. Various prudential regulations are made with respect to these remedies, but it may possibly happen, notwithstanding all these precautions, that a citizen who owes nothing, and has done none of the acts mentioned in the statutes, may be deprived of his estate without any actual knowledge of the process by which it has been taken from him. If we hold, as we must, in order to sustain this legislation, that the constitution does not positively require personal notice in order to constitute a legal proceeding *due process of law*, it then belongs to the Legislature to determine in the particular instance whether the case calls for this kind of exceptional legislation, and what manner of constructive notice shall be sufficient to reasonably apprise the party proceeded against, of the legal steps which are taken against him. A case may be supposed, where the reason for departing from the more safe rule of the common law is so plainly frivolous, or the provision for notice is so clearly colorable and illusory, that the courts would be called upon to declare the enactment a fraud upon the constitution.

The Supreme Court of the United States has several times pronounced State laws, professing only to regulate legal proceedings to be unconstitutional, as impairing the obligation of contracts, though that court admits to the fullest extent the juris-

diction of the State Legislature over legal remedies. See Morse *a.* Goold (1 *Kern.*, 281, and cases cited).

In the case under consideration, there was at least a plausible reason for not requiring actual notice. The shareholders in banking associations are frequently very numerous, and although the books ought to disclose their names, such is not always the case. Every one in any way connected with a bank would be likely to hear of a fact so notorious as that it had stopped payment, and that its affairs had passed into the hands of a receiver. If, then, all of the parties sought to be charged who reside in the same town are actually notified, and public notice given in several journals in regard to all others, the parties interested will be likely to hear of the proceeding. The probability of actual knowledge would be equally great in respect to the creditors, as the holders of the liabilities of a bank are very likely to know that it has failed. I conclude, therefore, that the proceeding does not lose the character of legal process, within the constitutional provision, by the omission to require personal notice to be given to all the parties to be charged as stockholders.

There is no valid objection to the forum. The special term of the Supreme Court is a constitutional tribunal, and although the decision is to be made in the first instance by a referee, this is no more than is done in a large class of regular actions which are prosecuted in that court. The stockholders cannot complain that they have not a sufficient opportunity to review the determination of the referee, for, as has been mentioned, they are not only entitled to be heard upon the confirmation of his report, but to appeal from the judgment to the general term of the Supreme Court, and to this court.

There are some other objections arising out of the provisions of the constitution, as to which very little requires to be said. It is objected that corporations cannot be proceeded against except by regular suit, for which position section 3, of article 8, is relied on, which declares that corporations shall have the right to sue, and shall be subject to be sued in all courts in like cases as natural persons. This is an enabling and not a restrictive provision, and it permits corporations to be parties to suits in justices' courts, contrary to the rule which formerly prevailed; but the provision has no bearing upon the statute for winding up insolvent corporations. It has sometimes been maintained, though

not, I think, by the counsel in this case, that the act is in con-
flict with the very provision of the constitution rendering the
stockholders liable for the debts, though it professes in terms to
be an act to enforce these liabilities. The argument for this is,
that the liability for the stockholders cannot be enforced in any
other manner than in that provided by the act (§ 1), and that a
remedy is not afforded in all cases; because, by section 7, pro-
ceedings can only be instituted by a creditor having a demand
to the amount of one hundred dollars or more. This argument
might probably be satisfactorily answered by the maxim *de
minimis non curat lex ;* but by referring to section 6, it will be
seen that the proceeding may be instituted by any creditor
who has obtained judgment and execution against the bank for
any amount, upon proof that the debt cannot be collected by
execution. Finally, it is argued by one of the counsel in this
case, that the section of the constitution imposing the liability
upon the stockholders is limited to the capital stock paid in, or
agreed to be paid in, and does not require the contribution of a
further amount, equal to the stock held by each shareholder.
This would give the public no security beyond what they had
under existing laws, for the assets of the corporation and any
unpaid subscriptions to its stock were always liable to its credi-
tors. That is the ordinary liability of the corporation. The
constitution adds the individual responsibility of the stockholders,
and the measure of that liability is the amount, or, as it would
be better expressed, a sum equal to the amount of their respec-
tive shares of stock. This construction had been given by the
court to similar language before the adoption of the constitution.
(Briggs *a.* Penniman, Bank of Poughkeepsie *a.* Ibbotson, 24
*Wend.*, 473.)

The statute not being subject to any constitutional objection,
and the special term having acquired jurisdiction of the case,
we are next to inquire whether there was a discontinuance which
would render the subsequent proceedings void, for want of con-
tinuing jurisdiction.

The referee is required to report to the first special term after
the expiration of six weeks from his appointment (§ 18).

On the 29th of October, 1855, and during the sitting of the
special term at which, by this provision, he was bound to report,
a justice of the Supreme Court made an order staying proceed-

ings for six months from its date; and before the expiration of that time, another justice made a similar order, dated April 28, 1856, for a further period of six months from that time. These orders suspended all proceedings before the referee to the 29th of October, 1856. The orders were severally made upon the applications of creditors and stockholders, who stated on oath that litigations between the receiver and debtors and creditors of the bank were pending, which would affect the amount which the stockholders would have to pay, and, according to the belief of the applicants, would wholly prevent the necessity of an assessment against them. By section 28 of the act, the apportionment may be suspended for such a cause, not exceeding one year. These orders were therefore warranted by the act. It was said by the counsel for the receiver, and not denied on the other side, that there was no special term sitting on the 29th of October, and that none was held until the ensuing December. At the December term the referee represented that he had not completed his report, and could not do so within the time allowed by the statute. A further order was therefore granted on the 16th of that month, giving the receiver ninety days from its date to complete the apportionment, and report it to the court. Before that period had fully expired, the report was presented and filed. From this statement it will appear that there was no default on the part of the referee, when he applied for the last-mentioned order; and section 18 declares that, if, in the opinion of the justice, further time is required to enable the referee to complete the apportionment, he may allow such time, not exceeding ninety days. All these orders appear, therefore, to have been in conformity with the act. It is true that somewhat more than one year and ninety days elapsed between the time the report would have been due, if no order had been made, and the time when it was presented, but it was owing to the casual circumstance that the court was not in session when the last six months' order expired. The order giving time to the referee, on his own account, could only be made by a justice at a special term. He had a right to make an order for the whole period of ninety days, if the circumstances in his judgment required it, though a delay had already occurred in waiting for a special term.

It should not be inferred, because we have taken pains to

show that no laches on the part of the referee occurred, that if such were the case, the future proceedings would be void. Upon the order of reference being made, the Supreme Court became possessed of the case, and a neglect on the part of the referee would no more put the parties out of court, than the omission of a referee in an ordinary action to make his report in time, would have that effect. But if the proceeding should be regarded as not taking place in a court of general jurisdiction, but should be assimilated to a special proceeding before an inferior magistrate, we still think the time fixed for the performance of intermediate steps, after jurisdiction had been once acquired, should be regarded as directory merely, and that an omission to perform one or more of them in time would not render the whole proceeding abortive. The primary order, which in the case supposed would be valid, divests the corporation of its property, and appoints a trustee to administer it; so the order by which the proceeding against the stockholders was commenced was unobjectionable.

For the purpose of expediting further proceedings and preventing delay, certain periods are fixed for the subsequent steps. The law in these respects ought to be observed, but if a slip happens to occur, it does not render the whole process a nullity; but the officer or party delinquent should be made to respond, according to the nature and consequences of his fault.

Certain of the stockholders objected, upon the motion to confirm the report, that several sums, embracing an item of $59,851.40, had been included in the aggregate amount charged upon the stockholders, the same not being, as the objectors insisted, a valid and subsisting debt against the bank. This amount is mentioned in the receiver's report, in the schedule of debts annexed to it, as claimed by the alleged creditors, who, however, are not named; but it is added that it has not been allowed by the receiver, but that notice has been given to him that it will be litigated. On looking through the testimony reported by the referee, it does not appear that any proof was offered respecting it, and, indeed, it is not mentioned in these proceedings; but it is included in the sum of $140,889.81, apportioned among and required to be paid by the stockholders.

I infer from the language of the report, that the referee con-

sidered it his duty to take the amount reported by the receiver as the aggregate of the unpaid debts of the bank, without any authority on his part to pass any judgment upon it. I have already stated my views in respect to the jurisdiction of the referee in this particular. But if it be conceded that the receiver's determination as to the debts is conclusive, his report shows that he has not allowed this amount as a part of the debts of the bank. He treats it as a subject of litigation between the creditors claiming it, and the trust estate in his hands. Surely this is not an authority for giving judgment for it against the stockholders without further investigation.

The receiver's report stated, with sufficient particularity, a large amount of indebtedness, besides the disputed amount. This was sufficient to carry the case to the referee. It was not improper for him to state the amount claimed, but not allowed by him, though such statement was not required by the statute. According to my view, it was the business of the creditors concerned in the claims which the receiver had refused to recognize, to attend to their interests before the referee, and upon the motion to confirm the report, if they would insist upon their remedy against the stockholders.

In the absence of any testimony respecting the claims, and with the receiver's report respecting them before him, the referee was not authorized to charge them upon the stockholders. In the opinion of the special term it is said that no injury can eventually happen to the stockholders by the allowance of this sum, as they will be finally reimbursed under section 24; and section 23 declares that neither the making of a dividend, or of an apportionment among the stockholders, is to be delayed beyond one year on account of litigations instituted to establish debts, but the proportion which would be due to a party seeking to establish a claim against the bank is to be retained, to be subsequently applied according to the event of the prosecution. But the act cannot be so construed as that money shall be collected from the stockholders on account of alleged debts simply claimed, but not in any manner established or allowed. Hence I am of opinion that the special term of the Supreme Court, instead of confirming the report, should have referred the same back to the same or another referee for further proof.

If this shall be done hereafter, it may be shown by the creditors, or by the receiver as their trustee, that a recovery has been had for the disputed claims ; or if no court has passed upon them, that they are well founded in fact. If no such proof shall be given, then the indebtedness which is undisputed, or which has been established, should be apportioned among the stockholders.

The foregoing observations dispose of the several general objections which have been taken to the report. But certain of the parties charged as stockholders appealed to the general term, on account of alleged erroneous decisions in respect to their particular case ; and as a further hearing before a referee will have to take place, it is proper for us to dispose of these further questions, some of which are of considerable practical importance.

1. The United States Fire Insurance Company and several others appealed because they had been charged as stockholders in respect to the stock standing in their names, but which, as they alleged and proved before the referee, they held only by way of hypothecation as security for money loaned. The referee charged the debtors who had transferred the stock, but the special term reversed that determination, and made the apportionment against the parties in whose names it stood. In regard to two of the persons thus charged, Struthers and Pearsall, the money had been paid and the script returned to the borrowers, but the evidence tended to show that this occurred after the bank had stopped payment, and after these proceedings had been commenced. It had never been re-transferred on the books of the bank. It has been recently decided in this court, in a case under the General Manufacturing Act of 1811, but which was in other respects precisely like the present, that the creditor to whom stock hypothecated had been transferred on the company's books, was the person to be charged under the liability clause contained in that act. There is no legal distinction between the words *members of the company* used in the act of 1811, and the term *stockholders* employed in the constitution and the act of 1849. But there are other parts of the last-mentioned act which must be considered. It is declared that the term *stockholder* as used in the act " shall apply not only to such persons as appear by the books of the corporation or association

to be such, but also to every equitable owner of stock, although the same may appear on such books in the name of another person" (§ 2). The persons who were stockholders when the debt was contracted are the ones to be charged; but this liability is shifted to the purchasers where the stock is transferred on the books, *bona fide*, prior to a default in paying the debt (§ 3.) Banks are bound under a penalty to keep a list of their stockholders, and a statement of the registered transfers, and to exhibit them when required. The books containing these lists and statements are made presumptive evidence of their contents, but the presumption may be repelled (§ 4).

The debts left unpaid when the bank failed, were contracted either while these parties held the stock, or when it was held by some fewer proprietors, so that no question arises under that portion of the third section. Nor does it appear to me that making the books presumptive evidence, with the qualifications mentioned, is material. As to these parties the books are true, for the transfers in question were actually made as there mentioned, with the assent of the parties. The presumption is not repelled, but confirmed. If the parties who complain can escape from responsibility, it must be on the ground that the debtors who hypothecated the stock are the equitable owners within the intention of the second section, and the parties to be charged in exoneration of the creditors assessed by the special term.

The Legislature manifestly intended to enforce the constitutional provision. This is stated in terms in the title of the act, and is apparent from its provisions. We are not at liberty to construe the second section in such a manner as to exempt from liability any parties whom the constitution has made liable, but there is not the same objection against holding that the statute comprehends others not made liable by the constitution.

All those who are properly termed stockholders must contribute to the extent declared by the constitution; and in addition to this the Legislature has power to include parties equitably interested in the stock, but who were not actually stockholders. Stockholders who have transferred their shares by way of hypothecation, certainly retain an equitable interest in them, and hence are in some sense equitable owners; but the

parties to whom the stock was transferred and registered are the stockholders. This was decided in a well-considered case in the former Supreme Court, shortly before the constitution was adopted (Adderly *a.* Storm, 6 *Hill*, 624): and when the constitutional convention came to attach a liability to stockholders of banks, it may be fairly concluded that the term was used in the sense which the court had affixed to it. The act does not declare that persons appearing on the books of the corporation to be stockholders, shall be exempt from liability when another person is the equitable owner. The enactment is, that the term stockholder is to apply not only to those appearing by the books to be stockholders, but also to every equitable owner of stock standing in the name of another. If the referee had assessed both parties to the hypothecation, where the stock had been registered in the name of the lender of money, an argument of considerable force could be made in favor of the decision. The creditors would be more fully protected by having the responsibility of both parties, and the execution could be levied upon the borrower, who ought, in equity, as between himself and the lender, to be primarily charged if he possessed property out of which the charge could be satisfied. But neither party has contended for that rule, and we have only to decide whether the lenders to whom the stock had been transferred on the books, were legally chargeable. I am of opinion that they are fairly included in the constitutional provision, and that the Legislature has not attempted to establish a different rule. If the statute does not admit of a joint judgment against both parties to an hypothecation, and if the party registered as a stockholder must be exonerated whenever the equitable owner of the same stock is charged, then I am of opinion that the provision charging the equitable owner should be limited to cases where the party who is registered as the owner is merely a nominal holder. A trustee, legally authorized to invest the funds of another in bank stock, but who had no personal interest, would be such a holder. So one whose name had been used as a transferee of stock without his consent; and so, I think, of a holder by hypothecation for a debt, who had received payment, and given a power of attorney to re-transfer the stock before the failure of the bank. The person making the transfer is not the equitable owner in case of an hypothecation. He has, it is true, an equita-

ble interest, but is not, in any proper sense, an owner. He can neither receive the dividends, vote upon the stock, or compel a transfer, while the debt remains unpaid. He has precisely the same interest which the purchaser of stock under an executory agreement without a transfer, and before paying the purchase price, would have; and yet no one would consider such a purchaser an owner in any sense, or suppose he could be assessed as a stockholder. On this part of the case I concur in opinion with the special term.

Other parties appealed to the general term, because, as they alleged, they had been charged in respect to stock standing in their names, but which they held as trustees for the bank itself. An effort appears to have been made by the directors to sustain the credit of the stock by becoming purchasers of it in the stock market. This was done in the name of one of their number, or some person friendly to them. The note of the purchaser was taken by the bank, which then advanced the money for the stock to the seller, upon a discount of the purchaser's note, and the transfer made to the individual purchaser. The plan was, that it should be so held until a real purchaser could be found, to whom it was then to be transferred.

During this state of things the bank failed. It was in proof that the directors did not consider that they had a right to purchase stock in behalf of the bank, being advised that it was illegal. I am of opinion that the referee was right in charging the persons in whose name the stock stood, as the contributors towards the debts. There was not, in fact, any trust in favor of the bank, if it had a right to traffic in its own stock.

The most that can be said is, that the purchasers relied upon the directors who controlled the bank, to carry on the debt contracted by those purchasers, until other *bona fide* purchasers could be found. They all expected that such a time would arrive, but while thus waiting, the directors were deprived of their power, and the parties who assumed the risk of holding the stock must abide by the consequences.

Jonathan Purdy appealed, because, as he contended and attempted to prove, he was a creditor as well as a stockholder of the bank. He claimed to set off the indebtedness of the bank to him against his liability. Under the Manufacturing Act, and in some other corporations, a creditor might sue a single stock-

holder, who might set up, in restriction of his liability, that he was also a creditor. In such a case no account could be taken, and it would not regularly appear but that the plaintiff's debt was the only one existing against the corporation, nor could it be shown but that there were other stockholders who were not creditors, whose liabilities were sufficient to satisfy the plaintiff's debt. In such a case the defendant ought to be exonerated to the extent of his own debt. But under a proceeding for winding up a corporation, where an account of all the debts and of the effects, including the aggregate liabilities of the stockholders, is required to be taken, there is no reason why a creditor should be in any better situation on account of being at the same time a stockholder. In the latter character the constitution and the statute make him liable to an amount equal to his stock to the creditors, or to his just proportion of that amount if the whole is not required; but as a creditor he is entitled only to a dividend in proportion to the other creditors. In case of a deficiency in means to pay all his debts, he must take his dividend, *pro rata*. But if he could set off his claim as a creditor, against his liability as a stockholder, he might be paid in full, while the other creditors would receive only a part of the amount due them. The rule on this subject was explained in Garrison *a.* Howe (17 *N. Y. R.*, 458). I have looked over the other instances in which errors are supposed to have been committed by the referee and the special term, but do not find that any of the objections were well taken, except that I do not find any evidence to exonerate Claudius L. Monell, who appears on the stock-ledger to be the holder of 200 shares of stock, and was not assessed by the referee or by the justice at special term.

The judgment of the general term, which wholly discharged all parties who appealed to it, should be reversed. That judgment but an end to the proceeding upon grounds which, we think, cannot be sustained. But the judgment of the special term cannot be affirmed, because a large amount of assumed indebtedness was apportioned among the contributors which was not shown to exist, and because Mr. Monell, who, upon the evidence, appeared to be a stockholder, was not charged with his proportion of the indebtedness. The order to be entered here will be, That the judgments of the general and of the special

term be reversed, and that the proceedings be remitted to the Supreme Court, with directions to refer the report back to the same or another referee, for further proof and examination, who must be ordered to report a new apportionment, and the further proof which he may take, within a time to be fixed by the court. From the time which has elapsed, it is quite probable that material changes may have taken place in the amount of assets in the receiver's hands, and further facts may have been ascertained in respect to the amount of the debts. As the stockholders ought to be charged with the full amount of the unsatisfied debts, over and above the cash on hand applicable to their payment, and no more, the receiver should be examined before the referee, with a view to have an accurate account taken. If a recovery has been had for the $59,851.40, which the receiver disallowed, or any part of it; or if it can be otherwise shown to be a valid liability against the bank, it ought still to be included in the sum to be apportioned among the stockholders. So if any other debts are established, though not mentioned in the receiver's list, they are to be allowed by the referee.

NOTE.—On a subsequent application to the Court of Appeals, it appeared that the sum of $59,851.40, referred to in the above opinion, had been established as a valid claim against the bank, by a judgment of the Supreme Court, rendered *after* the order of the special term confirming the apportionment of the debts against the stockholders; and that the stock standing in the name of Monell had been cancelled and surrendered, in accordance with a judgment of the Superior Court.

Whereupon, the Court of Appeals modified the judgment directed to be entered in pursuance of the above opinion, and ordered that the judgments of the general term of the Supreme Court be reversed, and the judgment of the special term be affirmed.